# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued November 8, 2018        Decided May 3, 2019

No. 17-5242

GOVERNMENT OF THE PROVINCE OF MANITOBA,
APPELLEE

STATE OF MISSOURI, EX REL. ERIC SCHMITT,
MISSOURI ATTORNEY GENERAL'S OFFICE,
APPELLANT

v.

DAVID BERNHARDT, SECRETARY,
U.S. DEPARTMENT OF THE INTERIOR, ET AL.,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:02-cv-02057)

———

*Joshua M. Divine*, Deputy Solicitor, Office of the Attorney General for the State of Missouri, argued the cause for the appellant. *Joshua D. Hawley*, Attorney General, *D. John Sauer*, First Assistant and Solicitor and *Julie Marie Blake*, Deputy Solicitor, were with him on brief. *Laura E. Elsbury*, Trial Counsel, and *Eldon V. Greenberg* entered appearances.

*Anna T. Katselas*, Attorney, United States Department of Justice, argued the cause for the federal appellees. *Jeffrey H.*

*Wood*, Acting Assistant Attorney General, *Eric Grant*, Deputy Assistant Attorney General, and *Robert J. Lundman*, Attorney, were with her on brief. *Andrew C. Mergen*, Attorney, entered an appearance.

*Nessa Horewitch Coppinger* and *Ryan J. Carra*, Special Assistant Attorneys General, Office of the Attorney General for the State of North Dakota, and *Jennifer L. Verleger*, Assistant Attorney General, were on brief for the appellee State of North Dakota. *Scott M. DuBoff* and *Benjamin L. Lambiotte* entered appearances.

Before: HENDERSON, ROGERS and SRINIVASAN, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* HENDERSON.

KAREN LECRAFT HENDERSON, *Circuit Judge*: The Northwest Area Water Supply Project (Project) will someday send clean water from the Missouri River Basin to parched communities in northern North Dakota. That day has not yet come. For now, the Project's construction remains bogged down in long-running environmental litigation. This case, the most recent leg of the litigation marathon, involves the State of Missouri's complaint that the Bureau of Reclamation (Reclamation)—the federal agency responsible for carrying out the Project—violated the National Environmental Policy Act of 1969, Pub. L. No. 91-190, 83 Stat. 852 (1970) (codified as amended at 42 U.S.C. §§ 4321 *et seq*.) (NEPA), by failing to consider adequately how diverting billions of gallons of Missouri River water will affect downstream States.

Missouri brought this lawsuit on behalf of its citizens to prevent the Project from causing them harm. In legal language, Missouri sued in its *parens patriae* capacity. The

problem for Missouri is that, as a general matter, a "State does not have standing as *parens patriae* to bring an action against the Federal Government." *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 610 n.16 (1982). For this reason and others elaborated below, we agree with the district court that Missouri lacks standing and therefore affirm.

## I. BACKGROUND

Communities in northern North Dakota have long suffered from water shortages. North Dakota and Reclamation—an agency housed within the United States Department of Interior charged with, *inter alia*, managing and developing water resources—began seeking a solution in the late 1980s. Their efforts culminated in the Northwest Area Water Supply Project. The Project will "withdraw water from the Missouri River Basin and transport it via a 45-mile-long pipeline to the Hudson Bay Basin located in Northwest North Dakota." *Gov't of Province of Manitoba v. Zinke*, 849 F.3d 1111, 1114 (D.C. Cir. 2017). Over eighty thousand North Dakotans will gain access to clean water.

"The Project falls under the auspices of" NEPA, which "imposes 'a set of action-forcing procedures' requiring federal agencies to take a 'hard look' at any potential environmental consequences associated with their 'proposals and actions' and to broadly disseminate relevant environmental information." *Id.* at 1115 (quoting *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 756–57 (2004); *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989)). To that end, NEPA requires "all agencies of the Federal Government" to prepare an Environmental Impact Statement (EIS) before taking a "major Federal action[] significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). An EIS is not required, however, if the agency completes an

Environmental Assessment and makes a Finding of No Significant Impact. *New York v. Nuclear Regulatory Comm'n*, 681 F.3d 471, 476 (D.C. Cir. 2012); *see also* 40 C.F.R. § 1501.4 ("In determining whether to prepare an environmental impact statement the Federal agency shall . . . [p]repare a finding of no significant impact (§ 1508.13), if the agency determines on the basis of the environmental assessment not to prepare a statement."). NEPA itself does not provide a cause of action, *W. Org. of Res. Councils v. Zinke*, 892 F.3d 1234, 1241 (D.C. Cir. 2018); as a consequence, any challenge to agency action based on NEPA must be brought under the Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq*.

We earlier held that Reclamation has failed to "comply with NEPA's requirements" and has "left the Project mired in legal challenges" since 2002. *Gov't of Province of Manitoba*, 849 F.3d at 1115. Our decision there sets forth in detail the history of the litigation. *Id.* at 1114–17. We recount only the essentials. There were two Project-related lawsuits against Reclamation before this one. Manitoba brought the first challenge, claiming Reclamation failed to "adequately grapple with potential ecological problems caused by transferring treatment-resistant biota into the Hudson Bay Basin." *Id.* at 1115. The district court agreed, remanding to Reclamation its initial Finding of No Significant Impact. *Gov't of Province of Manitoba v. Norton*, 398 F. Supp. 2d 41, 67 (D.D.C. 2005). Four years later, Reclamation issued an EIS and Manitoba sued again. *Gov't of Province of Manitoba*, 849 F.3d at 1116. This time, the State of Missouri also filed suit, alleging that Reclamation "did not properly account for cumulative effects of water withdrawal from the Missouri River." *Id.* The district court sided with both challengers, criticized Reclamation's inadequate work and remanded for more NEPA analysis. *Id.*

In 2015, Reclamation issued a Supplemental Environmental Impact Statement (SEIS) for the Project. Manitoba[1] and Missouri again brought challenges, leading to this appeal. Reclamation moved for summary judgment, arguing that Missouri failed to establish standing. Specifically, Reclamation claimed that a State cannot sue the federal government as *parens patriae*, Missouri's sole basis for standing. Missouri did not dispute that it relied solely on a *parens patriae* theory of standing but maintained that a State can, at least under some circumstances, sue the federal government in its *parens patriae* capacity. The district court first noted that "Missouri is very clear that it sues in its role as *parens patriae* on behalf of its residents" and "advances no other basis for its standing." *Gov't of Province of Manitoba v. Zinke*, 273 F. Supp. 3d 145, 167–68 (D.D.C. 2017). It explained that under longstanding precedent, a State lacks *parens patriae* standing to sue the federal government. *Id.* at 162–68. The district court dismissed the complaint—a decision from which Missouri now appeals. Our review is *de novo*. *Scenic Am., Inc. v. U.S. Dep't of Transp.*, 836 F.3d 42, 49 (D.C. Cir. 2016) ("We review the District Court's decision (or lack thereof) as to standing *de novo*.").

## II. ANALYSIS

Article III of the United States Constitution authorizes federal courts to decide only "Cases" and "Controversies." U.S. Const. art. III, § 2, cl. 1. "To present a justiciable case or controversy, litigants must demonstrate standing, among other requirements." *Pub. Citizen v. Nat'l Highway Traffic Safety Admin.*, 489 F.3d 1279, 1289 (D.C. Cir. 2007). "The 'irreducible constitutional minimum of standing' contains three requirements." *Steel Co. v. Citizens for a Better Env't*,

---

[1] Manitoba eventually settled with Reclamation.

523 U.S. 83, 102 (1998) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). "[A]s the party invoking federal jurisdiction," the plaintiff "bears the burden of establishing these elements." *Id.*

A State's standing depends on the capacity in which it initiates a lawsuit. Erwin Chemerinsky, Federal Jurisdiction 121 (7th ed. 2016) ("[A] distinction must be drawn between a government entity suing to remedy injuries that it has suffered and suing in a representative capacity on behalf of its citizens."). Two types of lawsuits are relevant here. The first, a direct injury lawsuit, allows a State to sue to redress its own injury. *Cf. Wyoming v. Oklahoma*, 502 U.S. 437, 448–49 (1992) (distinguishing between "claims of *parens patriae* standing" and "allegations of direct injury to the State itself"). For this first type of lawsuit, the State need meet only the ordinary demands of Article III—that is, establish injury-in-fact, causation and redressability, *West v. Lynch*, 845 F.3d 1228, 1230 (D.C. Cir. 2017). The second type, a *parens patriae* lawsuit, allows a State to sue in a representative capacity to vindicate its citizens' interests. *Pennsylvania v. Kleppe*, 533 F.2d 668, 671 (D.C. Cir. 1976) ("[I]n bringing the action also on behalf of all injured citizens of the state, and upon the relation of four named individuals, Pennsylvania invokes a parens patriae theory of standing."). For these lawsuits, the State must do more than meet Article III's irreducible minimum; it must assert a quasi-sovereign interest "apart from the interests of particular private parties." *Alfred L. Snapp & Son, Inc.*, 458 U.S. at 607. The Supreme Court has held that, at a minimum, a State has a quasi-sovereign interest "in the health and well-being—both physical and

economic—of its residents" and "in not being discriminatorily denied its rightful status within the federal system." *Id.* at 607. "One helpful indication in determining whether an alleged injury to the health and welfare of its citizens suffices to give the State standing to sue as *parens patriae* is whether the injury is one that the State, if it could, would likely attempt to address through its sovereign lawmaking powers." *Id.*

Missouri claims that this litigation asserts both a direct injury and a *parens patriae* injury. Both sides agree that the Project will eventually divert billions of gallons of Missouri River water each year to North Dakota communities. Missouri asserts a direct injury: the large-scale diversion of water will allegedly harm its own interests by (among other things) damaging its riverfront properties (especially farmland adjacent to the Missouri River) and its commercial navigation businesses and by modifying its borders with neighboring states. Missouri also asserts that the Project will harm its citizens, a harm it seeks to allay in its quasi-sovereign—that is, *parens patriae*—capacity. We address *seriatim* the two theories of standing.

## A. DIRECT INJURY

Reclamation contends that Missouri forfeited its direct injury theory of standing. We agree. Absent exceptional circumstances, a party forfeits an argument by failing to press it in district court. *D.C. v. Straus*, 590 F.3d 898, 903 (D.C. Cir. 2010); *Adams v. Rice*, 531 F.3d 936, 944–45 (D.C. Cir. 2008). And the ordinary rules of forfeiture apply to standing. *Huron v. Cobert*, 809 F.3d 1274, 1280 (D.C. Cir. 2016) (forfeiture "applies to standing, as much as to merits, arguments, because it is not the province of an appellate court to 'hypothesize or speculate about the existence of an injury [Plaintiff] did not assert' to the district court" (quoting *Kawa*

*Orthodontics, LLP v. Secretary, U.S. Dep't of the Treasury*, 773 F.3d 243, 246 (11th Cir. 2014) (alteration in original))). In district court, Reclamation argued that Missouri as *parens patriae* lacks standing to sue the federal government. Rather than preserve its direct injury theory, Missouri chose to rely solely on its *parens patriae* standing. This is textbook forfeiture.

Missouri responds that its complaint identifies a direct injury theory of standing and thus preserves that theory for our consideration. The complaint states that Missouri "brings this action on its own behalf and as parens patriae for its residents." But a threadbare allegation included in its complaint does not help Missouri. A party forfeits an argument by mentioning it only "in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones." *Schneider v. Kissinger*, 412 F.3d 190, 200 n.1 (D.C. Cir. 2005) (quoting *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990)). On summary judgment, plaintiff Missouri had to identify record evidence establishing its standing to sue Reclamation. *See Swanson Grp. Mfg. LLC v. Jewell*, 790 F.3d 235, 240 (D.C. Cir. 2015); *Abigail All. for Better Access to Developmental Drugs v. Eschenbach*, 469 F.3d 129, 132 (D.C. Cir. 2006) ("[T]he party invoking the court's jurisdiction must establish the predicates for standing 'with the manner and degree of evidence required at' that stage of trial." (quoting *Lujan*, 504 U.S. at 561)). The simple allegation that Missouri "brings this action on its own behalf" does nothing to explain Missouri's standing under a direct injury theory or to identify the evidence required at summary judgment.[2]

---

[2] At oral argument, Missouri contended that a party need not brief a "legally self-evident" theory of standing at summary judgment. "Generally, arguments raised for the first time at oral argument are forfeited." *U.S. ex rel. Davis v. D.C.*, 793 F.3d 120,

The only remaining question is whether an extraordinary circumstance excuses Missouri's forfeiture. *See Flynn v. Comm'r*, 269 F.3d 1064, 1068–69 (D.C. Cir. 2001). As far as we can tell, nothing in the record manifests that Missouri's forfeiture of its direct injury theory was anything other than a tactical decision. And Missouri does not argue otherwise. Accordingly, we conclude that Missouri has forfeited its direct injury theory.

## B. *PARENS PATRIAE* CAPACITY

Missouri faces an uphill climb in establishing standing in its *parens patriae* capacity. The traditional rule, the so-called "*Mellon* bar," declares that a State lacks standing as *parens patriae* to bring an action against the federal government. *Massachusetts v. Mellon*, 262 U.S. 447, 485–86 (1923) ("While the state, under some circumstances, may sue" as *parens patriae* "for the protection of its citizens, it is no part of its duty or power to enforce their rights in respect of their relations with the federal government."); *see also Alfred L. Snapp & Son, Inc*, 458 U.S. at 610 n.16; *South Carolina v. Katzenbach*, 383 U.S. 301, 324 (1966); *Florida v. Mellon*, 273 U.S. 12, 18 (1927); *Maryland People's Counsel v. FERC*, 760 F.2d 318, 320 (D.C. Cir. 1985). Missouri first counters that the *Mellon* bar does not apply to this litigation because it is displaced by the APA. It also contends that the Supreme Court's holding in *Massachusetts v. EPA*, 549 U.S. 497 (2007), precludes application of the *Mellon* bar here.

### 1. THE *MELLON* BAR APPLIES TO APA CASES

Missouri contends that the *Mellon* bar does not apply to litigation the State brings against the federal government under

---

127 (D.C. Cir. 2015). And Missouri offers no basis for excusing its forfeiture.

the APA. We have indeed recognized that the *Mellon* bar speaks to prudential, not Article III, standing which the courts designed to prevent a State from encroaching on the federal government's power. *Maryland People's Counsel*, 760 F.2d at 321–22; *Kleppe*, 533 F.2d at 676–77 (discussing *Mellon* bar purpose); *cf. Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 & n.4 (2014) (explaining "prudential standing" label is misleading because doctrine concerns whether plaintiff has cause of action under relevant statute and "'the absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction, *i.e.*, the court's statutory or constitutional *power* to adjudicate the case.'" (quoting *Verizon Md. Inc. v. Public Serv. Comm'n of Md.*, 535 U.S. 635, 642–43 (2002))). Because the *Mellon* bar is prudential, we have held that the Congress may by statute authorize a State to sue the federal government in its *parens patriae* capacity. *Maryland People's Counsel*, 760 F.2d at 322. Missouri believes the APA is such a statute and allows its lawsuit against Reclamation to proceed.

Our leading precedent in this area is *Maryland People's Counsel v. FERC*, 760 F.2d 318 (D.C. Cir. 1985).[3] There, we concluded that the judicial review provision included in the Natural Gas Act of 1938 (NGA), Pub. L. No. 75-688, 52 Stat. 821 (codified at 15 U.S.C. §§ 717 *et seq.*), is not subject to the *Mellon* bar. *Id.* at 320–21 (citing 15 U.S.C. § 717r(b)). Our analysis is instructive. The NGA authorizes States to participate in proceedings before the Federal Energy

---

[3] Missouri asserts that earlier precedent, *Pennsylvania v. Kleppe*, 533 F.2d 668, 677 n.55 (D.C. Cir. 1976), held that the APA abrogated the *Mellon* bar and allowed a State to sue the federal government in its *parens patriae* capacity. We did not conclude that Pennsylvania had standing in *Kleppe*; Missouri's claim that *Kleppe* adopted a bright-line rule that a State has *parens patriae* standing under the APA is, therefore, in error. *Id.* at 680.

Regulatory Commission (FERC). *Id.* It also gives States a cause of action to sue FERC based on those proceedings. *Id.* at 321. But States are generally not purchasers of natural gas. *Id.* This fact led us to infer that the NGA's judicial review provision is "evidently designed to recognize precisely the interest of the states in protecting their citizens in this traditional governmental field of utility regulation—that is, the states' *parens patriae* interest." *Id.* Because the Congress intended a State to sue FERC based on its "*parens patriae* interest[s]," we held that an NGA suit brought by a State is not subject to the *Mellon* bar. *Id.* at 321–22 (describing "congressional elimination of the rule of *Massachusetts v. Mellon*" as "effective").

The APA generally provides a cause of action to any "person . . . adversely affected or aggrieved by agency action." 5 U.S.C. § 702. There is little doubt that a State qualifies as a "person" under the APA. *See Maryland Dep't of Human Res. v. Dep't of Health & Human Servs.*, 763 F.2d 1441, 1445 n.1 (D.C. Cir. 1985) ("If a foreign government and its agencies are persons within the meaning of the APA, it seems clear that a state and its agencies also are."). To sue in its *parens patriae* capacity, moreover, a State must suffer an injury to its quasi-sovereign interest, *Alfred L. Snapp & Son, Inc.*, 458 U.S. at 607, and thus must be "adversely affected or aggrieved," 5 U.S.C. § 702. Unlike the NGA, however, the APA evinces no congressional intent to authorize a State as *parens patriae* to sue the federal government. The APA's judicial review provision authorizes suit by a "person" challenging agency action and the APA definition of "person," by implication only, includes a State, 5 U.S.C. § 701(b)(2) ("'[P]erson' . . . ha[s] the meaning[] given . . . by section 551 of this title."); 5 U.S.C. § 551(2) ("'[P]erson' includes an individual, partnership, corporation, association, or public or private organization other than an agency."). The APA's judicial review provision

allows a person to challenge agency action taken under many different statutes. *See Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 345 (1984) (APA confers "a general cause of action"). It is not linked to any particular statutory scheme and—unlike the NGA—does not create an inference that the Congress intended a wholesale imprimatur allowing a State as *parens patriae* to sue the federal government. Accordingly, the *Mellon* bar applies to litigation that a State, using the APA, seeks to pursue against the federal government.[4]

## 2. THE *MELLON* BAR HAS NO EXCEPTION

Missouri also insists that the holding in *Massachusetts v. EPA*, 549 U.S. 497 (2007), creates an exception to the *Mellon* bar that allows its lawsuit against Reclamation to proceed. In that case, Massachusetts petitioned the EPA to promulgate a rule governing vehicular greenhouse gas emissions. *Id.* at 510. The EPA declined to regulate and Massachusetts sought judicial review. *Id.* at 510–15. The United States Supreme Court concluded that Massachusetts had standing in its own right to sue the EPA. *Id.* at 526. Its entire *parens patriae* discussion appears in footnote seventeen, two sentences of which are critical to Missouri's argument. *Id.* at 520 n.17. The first declares that "there is a critical difference between allowing a State 'to protect her citizens from the operation of federal statutes' (which is what *Mellon* prohibits) and allowing a State to assert its rights under federal law (which it has standing to do)." *Id.* (quoting *Georgia v. Pennsylvania R. Co.*, 324 U.S. 439, 447 (1945)). The second then states: "Massachusetts does not here dispute that the Clean Air Act *applies* to its citizens; it rather seeks to assert its rights under

---

[4] We note that Missouri has not made an argument that NEPA—as opposed to the APA—authorizes this suit notwithstanding the *Mellon* bar and thus we have no occasion to consider that argument.

the Act." *Id.* Missouri reads the footnote as establishing an exception to the *Mellon* bar for litigation in which a State "does not challenge the validity of a federal statute but instead sues the federal government to assert the State's own rights or those of its citizens under federal statutes."

But the Supreme Court had no need to carve out an exception to the *Mellon* bar in *Massachusetts v. EPA* because Massachusetts did not sue in its *parens patriae* capacity. *Accord Center for Biological Diversity v. U.S. Dep't of Interior*, 563 F.3d 466, 476–78 (D.C. Cir. 2009) (discussing *parens patriae* analysis in *Massachusetts v. EPA*). It instead "alleged a particularized injury in its capacity as a landowner." *Massachusetts*, 549 U.S. at 522. Because Massachusetts sued to remedy its own injury rather than that of its citizens, *Massachusetts v. EPA* is not a *parens patriae* case. There is some confusion on this score most possibly caused by the opinion's discussion of quasi-sovereign interests. *Id.* at 519–20. But that discussion related to the Supreme Court affording Massachusetts "special solicitude in [the] standing analysis." *Id* at 520. The Court explained that Massachusetts is entitled to "special solicitude" because (1) a State has a quasi-sovereign interest in "preserv[ing] its sovereign territory" and (2) the Congress afforded "a concomitant procedural right to challenge the rejection of its rulemaking petition as arbitrary and capricious." *Id.* at 519–20; *see also Texas v. United States*, 809 F.3d 134, 151 (5th Cir. 2015) (applying special solicitude doctrine). Notwithstanding the quasi-sovereign-interests discussion, however, Massachusetts asserted its own statutory right and alleged its own harm to establish an injury-in-fact, as footnote seventeen expressly recognizes, *Massachusetts*, 549 U.S. at 520 n.17 ("Massachusetts does not here dispute that the Clean Air Act *applies* to its citizens; *it rather seeks to assert its rights under the Act*." (second emphasis added)); *see also id.* at 522 (Massachusetts "has

alleged a particularized injury in its capacity as a coastal landowner").

Nor does the text of footnote seventeen support Missouri's proposed exception. The first three sentences of the footnote dispute the dissent's characterization of *Mellon* as supporting the proposition that a State cannot assert a quasi-sovereign interest when suing the federal government. *Compare id.* at 539 (Roberts, C.J., dissenting) ("[T]he Court overlooks the fact that our cases cast significant doubt on a State's standing to assert a quasi-sovereign interest—as opposed to a direct injury—against the Federal Government."), *with id.* at 520 n.17 ("*Mellon* itself disavowed any such broad reading when it noted that the [*Mellon*] Court had been 'called upon to adjudicate, not rights of person or property, not rights of dominion over physical domain, [and] *not quasi-sovereign rights actually invaded or threatened*.'" (quoting 262 U.S. at 484–85)). For good measure, the two concluding sentences of the footnote distinguish the *Massachusetts* facts from those of *Mellon*. "In any event," they explain, "there is a critical difference between allowing a State 'to protect her citizens from the operation of federal statutes' (which is what *Mellon* prohibits) and allowing a State to assert its rights under federal law (which it has standing to do)." *Id.* (quoting *Pennsylvania R. Co.*, 324 U.S. at 447). The distinction is not, as Missouri suggests, between two types of *parens patriae* lawsuits, one permissible and one not. It is between a *parens patriae* lawsuit (what *Mellon* prohibits) and a State suing based on "its rights under federal law" (not a *parens patriae* lawsuit at all). *See Wyoming*, 502 U.S. at 448–49 (1992) ("[C]laims of *parens patriae* standing" differ from "allegations of direct injury to the State itself."); *cf. Kleppe*, 533 F.2d at 675 (describing *parens patriae* lawsuit as "representative action by the state").

Finally, Missouri's reading of footnote seventeen, if adopted, would establish an exception that makes little sense in light of the vertical federalism interest underlying the *Mellon* bar. As we have explained, an "individual's dual citizenship in both state and nation, with separate rights and obligations arising from each, suggests that both units of government act as parens patriae within their separate spheres of activity." *Id.* at 676–77. "The general supremacy of federal law" means "that the federal parens patriae power should not, as a rule, be subject to the intervention of states seeking to represent the same interest of the same citizens." *Id.* at 677. For that reason, a "state can not have a quasi-sovereign interest because" matters of federal law "fall[] within the sovereignty of the Federal Government." *Id.* It is the State's representation that usurps the role of the federal government, not the legal theory underlying its complaint. *Id.* at 676–77. There is no reason to treat *parens patriae* actions alleging constitutional claims against the federal government differently from those alleging federal statutory claims. We doubt the Supreme Court meant in footnote seventeen to create an exception to the *Mellon* bar based on such a distinction.

In the end, we are unpersuaded by Missouri's argument that *Massachusetts v. EPA* alters our longstanding precedent that a State in general lacks *parens patriae* standing to sue the federal government. *Accord Center for Biological Diversity*, 563 F.3d at 476–78 (rejecting, in dicta, that *Massachusetts v. EPA* creates exception to *Mellon* bar); *Maryland People's Counsel*, 760 F.2d at 320 ("[a] State does not have standing as *parens patriae* to bring an action against the Federal Government" (quoting *Alfred L. Snapp & Son, Inc.*, 458 U.S. at 610 n.16)); *Michigan v. EPA*, 581 F.3d 524, 529 (7th Cir. 2009) (per Wood, J.) (*Massachusetts* does not create exception to *Mellon* bar); *Commonwealth v. U.S. Dep't of Educ.*, 340 F. Supp. 3d 7, 14–16 (D.D.C. 2018) (same).

For the foregoing reasons, we affirm the judgment of the district court.

*So ordered*.